1

2

3

4

5

6

7                        UNITED STATES DISTRICT COURT

8                            DISTRICT OF OREGON

9                            PORTLAND DIVISION

10

11
KIM DANA DECKER,                                No. 6:11-cv-06344-HU
12
          Plaintiff,                            **FINDINGS AND**
13                                              **RECOMMENDATION**
     v.
14
CAROLYN W. COLVIN, Acting
15 Commissioner of Social Security,

16          Defendant.**¹**

17 ————————————————————
Alan Stuart Graf
18 316 Second Road
Summertown, Tennessee 38483
19
          Attorney for Plaintiff
20
S. Amanda Marshall
21 United States Attorney
Leisa A. Wolf
22 Special Assistant United States Attorney
Social Security Administration
23 701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
24
          Attorneys for Defendant
25

26 ————————————
     **¹** Carolyn W. Colvin became the Acting Commissioner of the
27 Social Security Administration on February 14, 2013, and is
substituted in place of former Commissioner Michael J. Astrue as
28 the defendant in this action. *See* FED. R. CIV. P. 25(d).

Page 1 - FINDINGS AND RECOMMENDATION

HUBEL, Magistrate Judge:

Kim Decker ("Decker") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI") under Titles II and XVI of the Social Security Act.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the Commissioner's decision should be REVERSED and REMANDED for further proceedings.

## I. PROCEDURAL HISTORY

Decker applied for DIB and SSI benefits on June 5, 2008.  Both of Decker's applications alleged a disability onset date of January 1, 1995.  The applications were denied initially on December 19, 2008, and upon reconsideration on April 15, 2009.  Decker appeared and testified at a hearing held on August 26, 2010, before Administrative Law Judge ("ALJ") Michael Gilbert.  The ALJ issued a decision denying Decker's claim for benefits on January 27, 2011. Decker then requested review of the ALJ's decision, which was subsequently denied by the Appeals Council on September 16, 2011. As a result, the ALJ's decision became the final decision of the Commissioner that is subject to judicial review.  This appeal followed on November 2, 2011.

## II. FACTUAL BACKGROUND

Decker injured her neck and back in a motor vehicle accident on January 20, 1995.  Between late January 1995 and early January 1996, Decker was under the care of physician Stan Kern ("Kern"), who diagnosed Decker with an acute cervical strain.  Kern

Page 2 - FINDINGS AND RECOMMENDATION

1 determined that Decker's condition was "medically stationary" as of
2 April 18, 1995.  (Tr. 454.)

3    Decker saw family practitioner Gary Beehler ("Beehler") for
4 follow-up treatment on January 15, 1996.  Beehler diagnosed Decker
5 with a "recurrence of the cervicothoracic sprain/ strain with
6 associated muscle tension headache and possible right upper
7 extremity paresthesias." (Tr. 454.)  According to Beehler, Decker
8 showed "progressive improvements in her upper back and shoulder
9 function with decreased painful symptoms" after receiving physical
10 therapy.  (Tr. 454.)

11    On April 11, 1997, Decker was evaluated by Donald Lange
12 ("Lange"), Ph.D., at the Office of Vocational Rehabilitation
13 Services ("OVRS") in Salem, Oregon.  Decker sought OVRS' services
14 due to chronic pain in her upper back and shoulders, as well
15 weakness in her right hand.  Lange conducted a battery of
16 psychological tests on Decker and concluded, among other things,
17 that she functions at the high school level in reading and
18 arithmetic and possesses an intellectual capacity "solidly in the
19 average range." (Tr. 246.)

20    Decker visited Daniel Harris ("Harris), MD, at Physicians
21 Medical Center on December 11, 1997, complaining of right arm
22 weakness and pain.  An examination revealed tenderness in Decker's
23 right shoulder, "particularly up over the subcromial bursa, but
24 also over [the] A/C joint and right scapula[.]" (Tr. 515.) Harris'
25 treatment notes indicate that Decker had been on Premarin for
26 estrogen replacement.

27    On January 7, 1998, Decker had a follow-up visit with Harris
28 because she continued "to have weakness, dropping things with the

Page 3 - FINDINGS AND RECOMMENDATION

1  right hand, numbness and tingling in both hands." (Tr. 489.)
2  Decker was diagnosed with "moderately severe right carpal tunnel
3  and mild left carpal tunnel." (Tr. 489.)  Later that summer,
4  Decker underwent surgery on her wrists to alleviate the symptoms of
5  carpal tunnel syndrome.

6      Decker returned to Physicians Medical Center on April 1, 1998,
7  complaining of mood swings, headaches, hot flashes and emotional
8  lability.    Harris    diagnosed    Decker    with    post-menopausal
9  symptoms—which seemed to improve when Decker took Estace (used to
10 treat symptoms of menopause) twice daily—and increased her dosage
11 of Premarin.  Harris also prescribed Wellbutrin because he thought
12 Decker "may also have some depression." (Tr. 487.)  About month
13 later, on May 6, 1998, Decker reported that her menopausal symptoms
14 had improved on the higher dose of Premarin.

15     On December 30, 1998, Decker visited Paul Haddeland
16 ("Haddeland"), MD, at Physicians Medical Center, complaining of
17 "right neck, shoulder and hip pain, and general muscle aches on
18 [her right] side, especially with temperature changes." (Tr. 511.)
19 Although Decker had recently been put on Vicodin and a muscle
20 relaxer, Haddeland encouraged Decker "to return to anti-
21 inflammatories instead of using narcotics." (Tr. 511.)

22     On June 9, 1999, Decker saw Haddeland because she was
23 experiencing bowel problems and "three weeks of regular headaches."
24 (Tr. 510.)  A neurovascular exam of Decker's upper extremities
25 appeared normal and her cranial nerves were intact.  Almost six
26 months later, on November 30, 1999, Haddeland referred Decker to
27 Gordon Banks ("Banks"), MD, "to see if he might have some
28 suggestions for improvement" of Decker's chronic muscle contraction

Page 4 - FINDINGS AND RECOMMENDATION

1 headaches.   (Tr. 509.)   At that time, Decker's depression had
2 improved and she "had a significant decrease in panic attacks"
3 after being prescribed Paxil within the last month.

4    Beginning in late December 1999, Decker was treated by Banks
5 at Willamette Valley Neurology.   According to Banks, Decker
6 appeared to have "some subtle . . . motor and sensory [impairment]
7 on the right side which may indicate a contusion of the brain at
8 the time of the [January 1995 motor vehicle] accident." (Tr. 469.)
9 Banks explained that the headaches Decker complained of "are a very
10 common concomitant with [a] head injury of this nature, as well as
11 memory problems and . . . emotional lability." (Tr. 469.)   Decker
12 was prescribed Maxalt for her headaches.

13    In March and June 2000, Decker had follow-up visits with
14 Haddeland regarding continued fatigue, and pain and numbness in her
15 right arm.   Decker reported that her pain had improved (e.g., "it
16 [wa]s very intermittent"), but she was still experiencing numbness
17 that radiated "down the ulnar side into the fourth and fifth
18 digits." (Tr. 508.)   Haddeland's treatment notes indicate that,
19 along with Paxil, Premarin and Depakote, Decker had been prescribed
20 Naprelan, a nonsteroidal anti-inflammatory used to relieve pain
21 caused by arthritis.

22    Between February and November 2001, Decker was treated on
23 several occasions by Haddeland for depression; a cough; right ear
24 congestion; and pain in her right hip, thumb, wrist and elbow.
25 Haddeland diagnosed Decker with probable depression, asthmatic
26 bronchitis, De Quervain's syndrome (tendinitis) of the right thumb,
27 serous otitis media (a collection of non-infected fluid in the
28

Page 5 - FINDINGS AND RECOMMENDATION

1  middle ear space), sinusitis (inflammation of the air cavities
2  within the passage of the nose), and tennis elbow.

3      On June 18, 2002, Decker visited Haddeland, complaining of
4  "increasing amounts of pain in her right trapezius [muscle] and
5  right shoulder area with radiation occasionally down to the third
6  digit."   (Tr. 529.)   Haddeland increased Decker's dosage of
7  ibuprofen and recommended alternating applications of heat and ice.

8      In October 2005, Decker sought OVRS' services once again after
9  relapsing on drugs.[2]   Documentation provided by OVRS indicates
10 Decker was suffering from amphetamine and marijuana dependence,
11 major depression, and myofascial pain syndrome.   Decker had
12 recently lost her job and was using drugs to cope with her pain,
13 which prompted OVRS to suggest that Decker "[m]ay need to return to
14 outpatie[nt] treatment."   (Tr. 263.)   Two months later, at the
15 request of OVRS, Decker returned to Physicians Medical clinic for
16 an evaluation.   Leslie Brott ("Brott"), MD, referred Decker for a
17 "full functional evaluation" prior to updating Decker's disability
18 letter.  (Tr. 529.)

19     On February 28, 2006, Decker was evaluated by the staff at
20 Chehalem Physical Therapy in Newberg, Oregon.   After conducting a
21 full body physical capacity evaluation, the evaluator concluded
22 that Decker "would be able to perform sedentary light work duties
23 without significant increase in her pain symptoms."   (Tr. 543.)
24 Because Decker was "quite fatigued by the end of the evaluation,"
25
26

27      [2] It is not entirely clear when Decker began using drugs. Most
28 of the evidence in the record of refers to drug use between 2005
   and 2008.

1  it was suggested that Decker would benefit from a conditioning
2  program or a gradual increase in work hours.  (Tr. 543.)

3      In April and May 2006, Decker attended four consultations with
4  counselor Linda Volz ("Volz").  Volz issued a report on May 17,
5  2006, stating: "[Decker] continues to need multiple supports for
6  vocational, mental health and recovery issues and has been using
7  those supports."  (Tr. 302.)  Volz went on to state: "[Decker]
8  would like part-time work and we reviewed her strengths/
9  limitations and she indicated a smaller business might be more low
10 stress for her.  Job examples included clerical positions involving
11 proofreading, filing and some computer [work]."  (Tr. 302.)

12     In July 2006, Decker finished a four-month course at Computer
13 Skills Plus, Inc. in Portland, Oregon.  Decker's certification of
14 completion indicates "[s]he . . . successfully updated her skills
15 to make her competitive once again in the job market."  (Tr. 306.)

16     In November and December 2006, Decker performed a combined
17 21.25 hours of job development activities at Independent Vocational
18 Rehabilitation Services Providers in McMinnville, Oregon.  Decker's
19 activities included performing mock interviews, searching and
20 applying for jobs, and drafting a cover letter.  She also completed
21 six hours worth of job development activities in February 2007.

22     On July 10, 2007, Decker's vocational rehabilitation
23 counselor, Paula Terry ("Terry"), wrote a glowing letter of
24 recommendation, stating that Decker exhibited "far above
25 average . . . enthusiasm, dependability and level of skills" while
26 volunteering at the Newberg Career Center as an office assistant
27 and customer service specialist.  (Tr. 344.)

28

Page 7 - FINDINGS AND RECOMMENDATION

1     In March 2008, Daniel W. Ray and Associates prepared a service
2 report summarizing their efforts to secure Decker a job.  The
3 report "noted that . . . [Decker] did not show up for an interview
4 that she had arranged with the temporary employment agency in
5 Eugene," much of which is "due to her cognitive and mental health
6 issues," presumably referring to emotional lability, depression,
7 panic attacks, mood swings and memory problems discussed above.
8 (Tr. 394.)   Also  in  March  2008,  Decker  was  seen  by  an
9 Otolaryngologist at Eugene Hearing and Speech Center.  Tests
10 revealed that Decker had "a moderately-severe sensorineural
11 [hearing loss] in the left ear and a severe to profound mixed
12 hearing loss in the right ear." (Tr. 547.)

13     In a letter dated April 17, 2008, James Knackstedt
14 ("Knackstedt"), MD, stated: "[Decker] had a middle ear effusion on
15 the right side.  This will prevent about 25% to 30% of hearing, so
16 I went ahead and performed a drainage procedure where I pierced the
17 eardrum, aspirated out the fluid, and placed a myringotomy tube.
18 She had immediate improvement in her hearing." (Tr. 730.)

19     Between May and June 2008, Decker spent 3-4 days a week
20 volunteering on "less than [a] part time basis" at the Greenhill
21 Humane Society as part of her vocational rehabilitation.  (Tr. 78.)
22 On June 10, 2008, Decker was fit for binaural behind-the-ear
23 hearing aids by Jessica Magro ("Magro"), Au.D., at Eugene Hearing
24 and Speech Center.

25     On September 6, 2008, Decker was referred to Alison Prescott
26 ("Prescott"), Ph. D., for a physiological evaluation by Disability
27 Determination Services. According to Prescott, Decker's full scale
28 IQ measured in the low average range and she "evidence[d] [signs]

Page 8 - FINDINGS AND RECOMMENDATION

of brain damage as a result" of two motor vehicle accidents. (Tr. 561.) Prescott diagnosed Decker with a major depressive disorder (Axis 1); cognitive disorder (Axis 1); and chronic pain in the right side, headaches and hearing loss (Axis 3).

On September 19, 2008, state agency physician K. Shah ("Shah"), MD, reviewed the medical record and completed a Physical Residual Functional Capacity Assessment ("PRFCA"). Shah determined that Decker had no extertional limitations, postural limitations, manipulative limitations or visual limitations. As to communicative limitations, Shah concluded that Decker had limited hearing capabilities necessitating the use of hearing aids, but no limitations in terms of speaking. Shah also found no environmental limitations were established, with the exception of needing to avoid concentrated exposure to noise. Overall, Shah concluded Decker did not meet or equal a "listing." (Tr. 572.)

On September 24, 2008, state agency psychologist Sonia Tyutyulkova ("Tyutyulkova"), MD, completed a Psychiatric Review Technique Form, wherein she evaluated Decker's impairments under listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.06 (anxiety-related disorders). Tyutyulkova concluded that Decker's impairments failed to satisfy the diagnostic criteria of listing 12.02, 12.04 or 12.06. She summarized her findings as follows:

> The course of depression is one of exacerbations and remission with treatment. Anxiety Disorder also is treated successfully by [primary care physician]. Allegation of [posttraumatic stress disorder] is not supported by the evidence. The combination of impairments is severe but does not meet or equal [a] listing.

Page 9 - FINDINGS AND RECOMMENDATION

1    1. No limitation in [activities of daily living],
     independent, does household chores with breaks, cooks,
2    cleans, does laundry, vacuuming, has hobbies, runs
     errands daily.
3    2. Minimal limitation in ability for appropriate social
     interactions, including ability to respond appropriately
4    to criticism and interact with co-workers.
     3. Less than substantial limitation in ability to
5    maintain pace and ability to complete a normal workday/
     workweek without excessive interruption from symptoms.
6    Claimant has good computer skills, reads the newspaper,
     able to maintain pace for 16 [hour a week] job.
7    4. Less than substantial limitation in ability to adjust
     appropriately to changes in the routine.

8

9    (Tr. 589.)

10       Tyutyulkova also completed a Mental Residual Functional

11   Capacity Assessment ("MRFCA") on September 24, 2008. Tyutyulkova's

12   MRFCA describes Decker as "[m]oderately [l]imited" in six of twenty

13   categories of mental activity and "[n]ot [s]ignificantly [l]imited"

14   in fourteen.

15       On October 10, 2008, Jul Orr ("Orr"), a vocational

16   rehabilitation counselor and director of self-sufficiency services

17   at St. Vincent de Paul Society of Lane County, prepared an

18   evaluation report indicating Decker was not ready for placement in

19   competitive employment. According to Orr, Decker's participation

20   in a 10-week situational assessment raised concerns about her

21   attendance, "production and quality with assigned tasks," emotional

22   stability, and ability to socialize appropriately with co-workers

23   and supervisors. (Tr. 218.)

24       On November 13, 2008, Decker was examined by DeWayde Perry

25   ("Perry"), MD, of MDSI Physician Services. Perry diagnosed Decker

26   with right shoulder arthralgia and right trochanteric bursitis.

27   Perry concluded that Decker had (1) no workplace environmental

28   limitations; (2) no manipulative limitations; (3) the ability to

Page 10 - FINDINGS AND RECOMMENDATION

1  "lift and carry 20 pounds occasionally and 10 pounds frequently
2  secondary to her bursitis"; and (4) occasional postural limitations
3  with respect to "stopping, kneeling, crouching, and crawling." (Tr.
4  596.)

5      Decker also had x-rays taken of her hands and lumbosacral
6  spine at Oregon Imaging Centers on November 13, 2008.  Orthopedic
7  surgeon Akbar Sadri ("Sadri"), MD, reviewed the results and
8  concluded that "no severe musculoskeletal impairment [could] be
9  established." (Tr. 600.)

10     On December 5, 2008, St. Vincent de Paul case manager Angela
11 Miller ("Miller") drafted a progress report indicating Decker had
12 been told to "stop counting" on her daughter's social security
13 survivor benefits for financial assistance, and instead "focus on
14 obtaining employment to support herself."  (Tr. 447.)

15     On December 23, 2008, OVRS counselor Leslie Thomas ("Thomas")
16 sent Decker a letter, stating that she was "highly concerned" with
17 Decker's "participation in [her] job search."  (Tr. 356.)  Thomas
18 went on to explain:

19     I understand that on two occasion now St. Vincent had a
       job lead and interview for you and they could not locate
20     you.   This lead to missed opportunities in a very
       difficult labor market.  There are few jobs and a lot of
21     competition in our current market.  There is no room to
       miss opportunities.  I am also concerned because [O]VR[S]
22     has spent $18,000 without an employment outcome.  Please
       plan on meeting with me [on January 5, 2009] as indicated
23     below.

24 (Tr. 356.)

25     On December 24, 2008, Decker told St. Vincent de Paul's job
26 placement specialist, Eric Jorgensen ("Jorgensen"), that she had
27 recently been "denied SSI benefits." (Tr. 445.)  In a report dated
28 January 2, 2009, Jorgensen provided the following response:

Page 11 - FINDINGS AND RECOMMENDATION

1 "[W]hile we feel for [Decker's] situation, we are concerned that

2 much of [her] condition is affectation, as was reported by the

3 Chehalem Physical Therapy report during her physical examination:

4 'It is the opinion of this evaluator that [Decker] exaggerated her

5 pain and limitations . . . .'"  (Tr. 445.)

6      On January 9, 2009, OVRS sent records to the Social Security

7 Administration on behalf of Decker.    These documents were

8 accompanied by a letter from Thomas, which stated:

9          I have worked for many years with [Decker] as her
           Vocational Rehabilitation Counselor. . . . Please also
10         note that [Decker] worked with Yamhill County Mental
           Health and Yamhill County Chemical Dependency while
11         residing in McMinnville.  This information would be
           useful in your decision making. . . . Although [Decker]
12         has education she has been fired from several jobs and
           lacks stability. . . . [Decker] is Amphetamine/ Marijuana
13         Dependent.  She has chronic pain in her neck, shoulders
           and lower back.  She has carpal tunnel as well as Major
14         Depression.  She has asthma and [D]eQuervain's Syndrome
           of the right thumb.  She has moderately-sever[e]
15         sensorineural hearing loss in the left ear and severe to
           profound possibly mixed hearing loss in the right ear.
16         [O]VR[S] assisted her to obtain hearing aids.

17 (Tr. 438.)

18      On January 14, 2009, Lane Independent Living Alliance prepared

19 a transferable skills assessment and consumer report after Decker

20 participated in seven, two hour classes on eliminating self-

21 defeating behavior ("ESDB") beginning in late October 2008.[3]  The

22 assessor, Claire Seminara ("Seminara"), QMHP, stated that Decker

23 "presents with multiple disabilities and the most significant

24 barriers to employment.  Her participation in the ESDB class

25 demonstrate[s] a need for skill building, she is not yet ready for

26

27      [3]  The report prepared by Lane Independent Living Alliance is
   dated January 14, 2009, but it was not signed off on until February
28 2, 2009.

Page 12 - FINDINGS AND RECOMMENDATION

job development/ placement services. . . . If [Decker] is to successfully identify, obtain, and maintain suitable employment, she will need substantial OVRS services." (Tr. 425.)

On February 2, 2009, OVRS discontinued Decker's services based on her "[f]ailure to [c]ooperate." (Tr. 430.)  Thomas explained that OVRS would no longer be providing services to Decker because she started missing appointment in December 2008

> and this pattern continued through [the end of January] when she missed an appointment at [O]VR[S] on January 29, 2009.  She also missed several appointments for job search[es] at St. Vincent de Paul.  She was informed that she needed to bring application when she came to job club and came repeatedly unprepared and would inter[r]upt the class. She does not seem interested in participating at this time. . . . Lack of participation/ cooperation is the primary reason for this closure. . . . Also planned services ha[ve] been delivered and extended without results.  No further services available.

(Tr. 432.)  The case management report prepared by Angela Miller ("Miller") of St. Vincent de Paul echoed Thomas' sentiments: "[W]e agree [with OVRS], given her lack of participation, we will be closing her file.  It d[oes] not appear that [Decker]'s true goal was to find meaningful employment, but rather be led in another direction because of her new relationship" (e.g., Decker checking out of the rescue mission to be with her new boyfriend who had been kicked out).  (Tr. 440.)

In a report dated February 10, 2009, Jorgensen elaborated on the efforts undertaken to obtain Decker a job, to no avail:

> [A] representative from Enterprise Car Rental . . . [was] very interested in [Decker] and had called us requesting to speak with her (we were using our own personal cell numbers so that potential employers could always get through to someone).  Because [Decker] was not here, we happily offered to take a message. Sabrina, the Enterprise representative, stated that she had received [Decker]'s application, was interested in talking with [Decker], and left her number.  We called [Decker]

Page 13 - FINDINGS AND RECOMMENDATION

1    immediately to inform her of the news.  We were told she
2    was not at the Mission.   When [Decker] finally called
     back at 3pm, we told her about the call and asked if she
3    could come down and return Sabrina's call.  [Decker]
     stated that due to the bus schedule she would be unable
4    to.  We offered to come and pick her up but she intimated
     that she had another appointment.  We asked her if she
5    was coming to the application session the following day
     to which she said yes. . . . [We called then and] Sabrina
6    asked to set up a phone interview for early Friday.

7    (Tr. 443.)   Jorgensen never heard from Decker again after the

8    placing the call during the application session.

9        On April 8, 2009, state agency physician Linda Jensen

10   ("Jensen"), MD, completed a PRFCA.  With respect to extertional

11   limitations, Jensen determined that Decker could lift and/ or carry

12   20 pounds occasionally and 10 pounds frequently; stand and/ or walk

13   6 hours in an 8-hour workday; sit for the same amount of time; and

14   push and/or pull an unlimited amount, subject to Decker's lift and/

15   or carry limitations.  As to postural limitations, Jensen concluded

16   that Decker could frequently climb ramps/ stairs and balance, and

17   occasionally climb ladder/ rope/ scaffolds, stoop, kneel, crouch,

18   and crawl.  Jensen determined that Decker had no environmental or

19   visual limitations.  With respect to manipulative and communicative

20   limitations, Jensen concluded that Decker was limited in terms of

21   reaching in all directions (including overhead) and hearing.

22       On May 29, 2009, Decker had x-rays taken of her right hip at

23   Oregon Imaging Center.  Erik Young ("Young"), MD, provided the

24   following interpretation of the x-rays: "AP view demonstrates

25   bilateral superior joint space narrowing in the hips, greater on

26   the right than the left.  AP and lateral views demonstrate some

27   osteophyte formation involving the right hip.  No fracture or

28   dislocation is seen." (Tr. 704.)

Page 14 - FINDINGS AND RECOMMENDATION

1    In early October 2009, Decker saw Karen Evensen ("Evensen"),
2  MD, at Sacred Heart Medical Center regarding three and a half weeks
3  worth of pain and swelling in her left elbow.  After finishing a 5-
4  day course of Presdnisone for what was presumed to be gout, Decker
5  underwent an irrigation and debridement of her left elbow on
6  October 13, 2009, and received intravenous antibiotic treatment for
7  a septic joint.  By mid-November 2009, Decker was making "a nice
8  recovery" after undergoing physical therapy and had the
9  peripherally inserted central catheter ("PICC line") removed from
10 her arm.  (Tr. 651.)

11   On March 9, 2010, Decker had x-rays of her chest and right
12 elbow taken at Oregon Imaging Centers.  With respect to Decker's
13 chest, Cathryn Chicola ("Chicola"), MD, made the following
14 findings: "Bones are unremarkable.  The cardiomediastinal
15 silhouette and pulmonary vasculature are normal.  The lungs show no
16 infiltrate, atelectasis, effusions or nodules." (Tr. 692.)  As to
17 Decker's right elbow, Chicola determined that no fracture,
18 dislocation, effusion, tissue calcification or erosions were seen,
19 and the elbow joint was "maintained."  (Tr. 693.)

20   On June 16, 2010, Decker had a treatment plan prepared by
21 Linet Armstrong ("Armstrong"), QHMP,[4] and cosigned by Robert Rogers
22 ("Rogers"), Ph.D., at ShelterCare—program that serves individuals
23 who have a disability and meet the federal definition of
24 homelessness.  At that time, Decker reported experiencing suicidal

25

26

27   [4] *See Vandeveerdonk v. Astrue*, No. 3-09-CV-1921-BD, 2011 WL
   4001059, at *6 (N.D. Tex. Sept. 8, 2011) (explaining that a
28 qualified mental health professional is not an acceptable medical
   source whose opinion is entitled to controlling weight).

ideation 2-3 times a day; confusion in dealing with paperwork and digesting health information; and anxiety attacks so severe that she would pass out once a week.  Armstrong's and Roger's diagnoses included posttraumatic stress disorder ("PTSD"); major depressive disorder; and a global assessment of functioning ("GAF") of forty, which "indicates some impairment in reality testing or communication, or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 n.3 (9th Cir. 2005) (citation omitted).

Decker had x-rays taken of her right elbow on June 9, 2010, and Young provided the following interpretation: "[T]he posterior fat pad is atypical.  This is usually only seen in conjunction with anterior fat pad displacement with fracture hemarthrosis or large joint effusion.  In a nontraumatic setting, this raises the possibility of an underlying joint effusion.  There is degenerative change involving the medial articulation in the elbow." (Tr. 788.)

On June 22, 2010, Decker was seen at the RiverBend Pavilion by Lisa Lamoreaux ("Lamoreaux").  Decker complained of "numbness and tingling in her little and ring finger, [and] increased pain in the ulnar side of her forearm." (Tr. 751.)  Lamoreaux concluded that Decker had "an obvious ulnar neuropathy," but "[t]he question [wa]s why." (Tr. 752.)  As a result, Lamoreaux "recommend[ed] nerve conduction testing." (Tr. 752.)  The next day, Decker saw neurologist James Kiley ("Kiley"), MD, and underwent diagnostic testing, including an electromyogram ("EMG") and nerve conduction velocity test ("NCV").  According to Kiley, it was

Page 16 - FINDINGS AND RECOMMENDATION

1    a normal EMG/NCV test of the left arm.  There was no
2    evidence [of] a left-side ulnar neuropathy.  I would
     recommend repeat testing in 3 months if symptoms persist.
3    There is a slight chance that [Decker] was studied too
     soon and, thus, the test showed a false negative result.
4    This would depend on when the inciting event occurred to
     produce the symptoms.  Please correlate clinically.

5    (Tr. 831.)

6        On June 29, 2010, Decker saw Lamoreaux "with a complaint of
7    10/10 pain regarding multiple body parts."  (Tr. 750.)  According
8    to Lamoreaux, "[t]he nerve conduction test showed no evidence of
9    ulnar neuropathy," and she "started to talk to [Decker] about doing
10   physical therapy, but she was very upset and angry, and left."
11   (Tr. 750.)

12       On July 2, 2010, Decker had x-rays of her left wrist taken at
13   RiverBend Pavilion.   Lamoreaux issued the following findings:
14   "There is moderate arthrosis of the thumb [carpometacarpal joint]
15   and scaphoid trapezial joints.  There is slight increased widening
16   of the scapholunate gap on the AP film with normal alignment on the
17   lateral."  (Tr. 754.)

18       On July 8, 2010, Decker underwent an aspiration of her right
19   elbow joint after being injected with "1.5 ml of non bacteriostatic
20   saline."  (Tr. 799.)  Young withdrew less than a milliliter of
21   "slightly pinkish joint fluid," and said "there appear[ed] to be
22   some underlying degenerative changes."  (Tr. 799.)

23       On July 19, 2010, Decker saw a physician's assistant,
24   Christopher Webb ("Webb"), again complaining of continued right
25   elbow pain, "[n]ew left wrist pain" and "[r]ecent cervical spine
26   pain."  (Tr. 789.)  Webb's treatment notes indicate he began seeing
27   Decker "a month or 2 ago," and he found it "obvious [that] she has
28   some sort of active inflammatory process going on systemically."

Page 17 - FINDINGS AND RECOMMENDATION

(Tr. 790.)   According to Webb, "the solution to [Decker]'s musculoskeletal complaints best lies with treatment by a rheumatologist," and in fact, one had been contacted and agreed to see Decker after hearing "about her situation and lab values." (Tr. 790-91.)

In a letter dated July 26, 2010, Marcus Farley ("Farley"), QHMP, of White Bird Medical Clinic stated:

> I have been working with [Ms.] Decker for one year as a mental health therapist at White Bird Clinic in Eugene, Oregon. [Ms. Decker] has attended individual therapy two to four times each month, completing 25 sessions between June 2009 and [the] present. . . .
>
> [Ms. Decker] has been diagnosed with [PTSD], Chronic (309.81), Major Depressive Disorder, Recurrent, Moderate Severity (296.32), and Panic Disorder with Agoraphobia (300.21).  In addition to these diagnoses, [Ms.] Decker has also experienced severe head trauma, primarily as a result of an automobile collision . . . . Head injuries resulted in cognitive dysfunction, including severe memory loss. . . .
>
> I have employed primarily Cognitive-Behavioral (CBT), Dialectical-Behavioral (DBT), and Narrative therapeutic modalities through my work with Ms. Decker. . . .
>
> . . . At no point during the past year do I feel that Ms. Decker would have been capable of functioning consistently within a structured work setting . . . [or] perform consistently or reliably in any work setting.

(Tr. 812-13.)[5]

On August 20, 2010, Armstrong reported that Decker scored a 27 out of 30 on the Mini-Mental Status Exam ("MMSE"), which presumably places her in the mildly impaired range. *See Battle v. Astrue*, 243 Fed. Appx. 514, 517 (11th Cir. 2007) (explaining that a claimant

---

[5]   The vast majority of the treatment records provided by White Bird Medical Clinic are handwritten and sometimes very difficult to read, but Farley's letter appears to adequately chronicle the course of treatment Decker received at the clinic.

Page 18 - FINDINGS AND RECOMMENDATION

scored 26 out of 30 on the MMSE, which placed "him in the mildly impaired range."); *Campbell v. Astrue*, No. 10-CV-459-PJC, 2011 WL 3734237, at *3 (N.D. Okla. Aug. 24, 2011) (psychologist gave claimant a score of 26 out of 30 on the MMSE, "indicating no organic impairment.")

Four days later, on August 24, 2010, Armstrong issued a letter recounting Decker's treatment at ShelterCare. Armstrong noted that Decker could not complete serial 7's and "required a great deal of effort" to recall "3 of 3 objects" and "spell 'world' backward" on the MMSE. (Tr. 821.) Armstrong went on to state that "Decker could not sustain full time employment without excessive absences from her job" due to "multiple physical and psychological issues that necessitate multiple appointments with multiple providers." (Tr. 822.) That same day, Armstrong completed a questionnaire concerning Decker's mental residual functional capacity. Armstrong described Decker as "[m]arkedly [l]imited" in seven of twenty categories of mental activity, "[m]oderately [l]imited" in eleven, and "[n]ot [s]ignificantly [l]imited" in the remaining two.

On August 26, 2010, a hearing was held before the ALJ in Eugene, Oregon. At the time of the hearing, Decker was 51 years old, 5'7" tall and weighed around 160 pounds. Decker testified that she attended Chemeketa Community College for three years and holds certifications as a nurse's assistant; "restorative aide"; "medication aide"; and "office specialist with XL Outlook Access." (Tr. 46.) Decker said that she lives in a van parked outside of a friend's house and smokes about a half a pack of cigarettes per day. She receives $200 dollars a month in food stamps and earns money by collecting cans and taking them to the recycle. Prior to

Page 19 - FINDINGS AND RECOMMENDATION

1   2008, Decker testified that she was convicted of driving of under
2   the influence of alcohol and used methamphetamine heavily and
3   marijuana "very rarely." (Tr. 58.) Decker lost her apartment in
4   November of 2008 after her daughter stopped receiving survivor
5   death benefits.

6        Decker claims she has not been able to work due to
7   osteoarthritis of the hip, back and elbow; nerve-related problems
8   with her right side; and difficulties keeping on task and retaining
9   information. She reported being prescribed Cymbalta and Seroquel
10  to combat her mental impairments, and 600 milligram ibuprofen for
11  inflammation and pain. Decker also suffers from a hearing
12  disability and bronchial asthmatic condition, which require her to
13  wear hearing aids and use an Advair inhaler. Decker said she has
14  experienced about "four or five" instances where she could hardly
15  move and had difficulty getting dressed due to physical pain. (Tr.
16  60.) Decker's pain is exacerbated during the winter when it is
17  cold; but she still makes an effort to walk about "three times a
18  week," perform physical therapy exercises on a daily basis, and
19  ride her bike on a weekly basis. (Tr. 62.)

20       Also on August 26, 2010, the ALJ received testimony from
21  Armstrong, who testified that her diagnostic impressions included
22  PTSD which triggers panic-like symptoms and a major depressive
23  disorder. Armstrong described Decker as a "pleasant, outgoing,
24  engaging, friendly" person, who reports difficulty with long-term
25  memory and "regularly requests assistance in filling out forms and
26  double[-]checking" the accuracy of her work. (Tr. 76-77.)

27       Lastly, the ALJ received testimony from vocational expert
28  ("VE") Kay Wise ("Wise"). The ALJ asked the VE to consider a

Page 20 - FINDINGS AND RECOMMENDATION

person of Decker's age, education and vocational background, who is able to perform a full range of light work subject to the following limitations:

> [C]limb[ing] ramps or stairs and balance are both at frequent.  Ladders, ropes or scaffolds, never, stoop, kneel, crouch and crawl are occasional. Manipulative limitations with the right extremity in overhead reach is limited to occasional. . . . [N]o greater than occasional exposure to excess noise secondary to hearing impairment. . . . [L]imited to occupations that do not require fine hearing capability.  Work should be limited to simple, routine and repetitive tasks.

(Tr. 87.)   After ruling out Decker's past relevant work as a certified nurse's aide and clerical assistant, the VE testified that an individual with these limitations could perform the jobs of soft goods sorter, office helper, and clerical sorter and addresser.   The VE confirmed that such a hypothetical individual could perform the three jobs identified, even if they could only "stand and walk for about two hours and sit up to six hours in an eight-hour workday with normal breaks"; "lift up to 20 pounds occasionally and lift and carry 10 pounds frequently"; and interact with coworkers and the public occasionally.  (Tr. 89.)

If the hypothetical individual identified was limited to sedentary work, the VE testified that the jobs of clerical addresser and optical goods worker would be the only viable options.   Such a hypothetical individual could not sustain competitive employment, however, if they could not complete simple, routine, repetitive tasks on a full-time basis, or missed work more than twice a month on average, due to mental impairments such as anxiety.  Nor would they be able to sustain competitive employment if they did not have bilateral use of the their hands more than occasionally; required frequent, non-critical supervision in order

Page 21 - FINDINGS AND RECOMMENDATION

1  to stay on task; or were distracted by the presence of large groups
2  of people "to the point that they don't continue working or . . .
3  leave the work place." (Tr. 93.)

4      In September and October 2010, Decker underwent a two-day
5  "neuropsych evaluation to determine her current level of cognitive
6  functioning." (Tr. 888.) Charlotte Higgins-Lee, Ph.D., prepared
7  a report indicating that her diagnostic impressions included
8  cognitive impairments and a history of PTSD and depression (Axis
9  I); a history of elbow pain and fibromyalgia (Axis III);
10 psychological stressors, such as pain, finances, health, hearing
11 impairment, and occupational problems (Axis IV); and a GAF of 45
12 (Axis V), which "indicates serious symptoms or serious impairment
13 in school, social or occupation functioning." *Moreno v. Astrue*, No.
14 2:11-cv-2454, 2013 WL 599962, at *6 n.4 (E.D. Cal. Feb 14, 2013).

15     On October 5, 2010, Decker visited Jill Chaplin ("Chaplin"),
16 MD, at RiverBend Clinic, complaining of hip pain.  According to
17 Chaplin's treatment notes, Decker "was seen in the emergency room
18 for this 3 days [prior] and treated with Percocet for likely
19 unacknowledged strain." (Tr. 924.)  Decker told Chaplin "she had
20 a history of rheumatoid arthritis," but Chaplin said Decker "has
21 had labs [at RiverBend] in the last 6 months that are not
22 consistent this [based on her] normal [C-reactive protein] and
23 [erythrocyte sedimentation rate]." (Tr. 924.)  Chaplin went on to
24 state she was uncertain as to the etiology of Decker's hip pain and
25 that "[Decker] is possibly exaggerating pain reaction with any
26 range of motion of the hip. . . ." (Tr. 924.)

27     On October 25, 2010, Decker was examined by Kurt Brewster
28 ("Brewster"), MD, an internal medicine doctor who had "[n]o medical

Page 22 - FINDINGS AND RECOMMENDATION

1  records available for review."[6]   (Tr. 899.)   After conducting a
2  comprehensive physical exam, Brewster observed that Decker had some
3  difficulty transferring on and off the examination table, but
4  Decker's "ability to transfer decrease[d]" as the exam went on.
5  (Tr. 901.)   He found Decker to be "grossly alert and oriented to
6  person, place and time," seeing as how she was able "to give a
7  comprehensive history and c[ould] follow multi-step directions."
8  (Tr. 901.)   In the conclusion of his report, Brewster recommended
9  "correlating [Decker's] symptoms with [the] medical records," but
10 "given [the] lack of findings on [the] exam," stated the he had "no
11 objective basis to limit [Decker] to the degree estimated."   (Tr.
12 906.)   He also estimated that Decker (1) could stand and walk six
13 hours in an eight-hour workday as long as she received fifteen
14 minute breaks every two hours; (2) had no restrictions with respect
15 to sitting; (3) did not need any assistive devices, nor were they
16 medically necessary; (4) had no restrictions on weight bearing; (5)
17 no postural limitations; (6) no fine or gross motor restrictions;
18 and (7) no environmental restriction.

19    On November 1, 2010, Decker was treated by Robert Pelz
20 ("Pelz"), MD, for pain and swelling in her left hand.   Pelz noted
21 that Decker was a "resident of a group home because of [a] previous
22 brain injury, though she is very highly functioning."   (Tr. 921.)
23 Decker returned to see Pelz the next day "because the pain in her
24 hand was excruciating, shooting up [her left] arm."   (Tr. 920.)
25
26

27    [6] Brewster also said it "was explained to [Decker], and she
28 understood that no patient/treating physician would be
   established."   (Tr. 898.)

1 Because Decker was "tearful in pain," Pelz prescribed her Vicodin
2 "so that she c[ould] get some adequate pain control." (Tr. 920.)
3 Pelz also prescribed Decker Prednisone to treat her hand, and her
4 pain subsided within a week.

5      On December 6, 2010, Decker visited Tara Workman ("Workman"),
6 MD, complaining of bilateral hip pain. Decker reported that "she
7 may have rheumatoid arthritis," but Workman did not see "anything
8 in her records to confirm this." (Tr. 916.) Workman provided
9 Decker with Vicodin and indicated that she wanted to see Decker's
10 records "from her previous doctors to see what evaluations she had
11 done because [Decker] may likely need an orthopedic referral for
12 further evaluation and treatment." (Tr. 916.) During a follow-up
13 visit on December 13, 2010, Workman noted that Decker had x-rays of
14 her hips taken, "which showed bilateral degenerative disease, right
15 worse than the left." (Tr. 914.) Workman decided to refer Decker
16 to an orthopedic surgeon for a consultation since Decker reported
17 experiencing "such severe pain." (Tr. 914.)

18      Decker was seen by orthopedic surgeon Thomas Hasbach
19 ("Hasbach"), MD, at RiverBend Pavilion on December 23, 2010.
20 Hasbach determined that Decker was not "yet a candidate for total
21 hip arthoplasty." (Tr. 911.) He also told Decker to consider an
22 injection of a corticosteroid to her right hip and suggested that
23 she use a front-wheeled walker to decrease her discomfort. Decker
24 received a therapeutic injection in the right hip four days later.

25      On January 5, 2011, Decker saw Workman and reported that she
26 was experiencing pain in her left hand and wrist. Workman noted
27 that Decker's uric acid level had been tested in the past and were
28 normal. Workman decided to prescribe Decker Prednisone and "sent

Page 24 - FINDINGS AND RECOMMENDATION

1  her for a uric acid level just to rule out gout at this point."
2  (Tr. 970.)  Laboratory results, dated January 5, 2011, showed that
3  Decker's uric acid levels (3.7) were normal.  (*Cf.* Tr. 972, *with*
4  Tr. 975.)  However, almost four weeks later, on January 31, 2011,
5  laboratory results revealed several abnormal findings: Decker's
6  rheumatoid factor was elevated to 73, as against normal values of
7  0-15 IU/ml; her sedimentation rate, westergren was elevated to 76,
8  as against a normal rate of 0-25 mm/hr; her platelet count was 406,
9  as against normal values of 150-400 k/mm3; and her red cell
10 distribution width was 14.5%, as against normal values of 11.5-
11 14.2%.  (Tr. 975-76.)[7]  Decker's uric acid levels were once again
12 normal, however.

13        **III. THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS**
14 **A.   Legal Standard**

15      A claimant is considered disabled if he or she is unable to
16 "engage in any substantial gainful activity by reason of any
17 medically determinable physical or mental impairment which . . .
18 has lasted or can be expected to last for a continuous period of
19 not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A).  "Social
20 Security Regulations set out a five-step sequential process for
21 determining whether an applicant is disabled within the meaning of
22 the Social Security Act."  *Keyser v. Comm'r Soc. Sec.*, 648 F.3d
23 721, 724 (9th Cir. 2011).  Those five steps are as follows:

24        (1) Is the claimant presently working in a substantially
25        gainful activity?   (2) Is the claimant's impairment

26 _____

27      [7]   There does not appear to be an interpretation of these
   laboratory results in the record.  (*See also* Pl's Opening Br. at 7)
28 ("Although it would take a physician to interpret these laboratory
   and treatment results . . . .")

Page 25 - FINDINGS AND RECOMMENDATION

severe?  (3) Does the impairment meet or equal [one of the listed impairments]?  (4) Is the claimant able to perform any work that he or she has done in the past? and (5) Are there significant numbers of jobs in the national economy that the claimant can perform?

*Keyser*, 648 F.3d at 724-25.  The claimant bears the burden of proof for the first four steps in the process.  If the claimant fails to meet the burden at any of those four steps, then the claimant is not disabled.  *Bustamante v Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001); *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and word experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).  If the Commissioner fails meet this burden, then the claimant is disabled, but if the Commissioner proves the claimant is able to perform other work which exists in the national economy, then the claimant is not disabled.  *Bustamante*, 262 F.3d at 954 (citations omitted).

**B.    The ALJ's Decision**

At the first step of the five-step sequential evaluation process, the ALJ found that Decker had not engaged in substantial gainful activity since January 1, 1995, the alleged disability onset date.  At the second step, the ALJ found that Decker had the following severe impairments: bilateral hearing loss, scoliosis, degenerative disc disease, degenerative joint disease of hips bilaterally, headaches, status-post septic elbow, major depressive disorder, cognitive disorder (not otherwise specified), anxiety disorder, PTSD, and a history of polysubstance abuse.

Page 26 - FINDINGS AND RECOMMENDATION

At the third step, the ALJ found that Decker's combination of impairments were not the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1.  The ALJ assessed Decker as having the residual functional capacity ("RFC") to perform light work, with certain limitations: (1) "claimant can perform only frequent balancing and climbing of ladders and stairs"; (2) "claimant cannot be required to climb ladders, ropes or scaffolds"; (3) "claimant can only occasionally perform stooping, kneeling, crouching, crawling, and overhead reaching with the right upper extremity"; (4) "claimant can be exposed to no more than occasional excessive noise"; (5) "claimant cannot perform work requiring fine hearing capability"; (6) "claimant can have only occasional interaction with coworkers and the public"; and (7) "claimant is limited to simple, routine, and repetitive tasks no greater than reasoning level 2."  (Tr. 15.)  At the fourth step, the ALJ found that Decker is unable to perform any past relevant work.  At the fifth step, the ALJ found in light of Decker's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that she could perform, including an office helper; soft goods sorter; and clerical sorter and addresser.  Based on the finding that Decker could perform jobs existing in significant numbers in the national economy, the ALJ concluded that she was not disabled as defined in the Act from January 1, 1995, through January 27, 2011.

## IV. STANDARD OF REVIEW

The court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'"  *Bray v. Comm'r Soc. Sec. Admin.*,

1    554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec.*
2    *Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)).  Substantial evidence
3    is "'more than a mere scintilla but less than a preponderance; it
4    is such relevant evidence as a reasonable mind might accept as
5    adequate to support a conclusion.'" *Bray*, 554 F.3d at 1222 (quoting
6    *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

7        The court "cannot affirm the Commissioner's decision 'simply
8    by isolating a specific quantum of supporting evidence.'"  *Holohan*
9    *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
10   *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
11   must consider the entire record, weighing both the evidence that
12   supports the Commissioner's conclusions, and the evidence that
13   detracts from those conclusions.    *Holohan*, 246 F.3d at 1097.
14   However, if the evidence as a whole can support more than one
15   rational interpretation, the ALJ's decision must be upheld; the
16   court may not substitute its judgment for the ALJ's.  *Bray*, 554
17   F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th
18   Cir. 2007)).

19                            **V. DISCUSSION**

20       On appeal, Decker offers two reasons why the court should
21   reverse the Commissioner's decision: (1) the ALJ improperly
22   rejected the opinion of her treating physician, Dr. Rogers; and (2)
23   new evidence (e.g., medical records provided by Workman for the
24   period December 27, 2010, through January 31, 2011) incorporated
25   into the record by the Appeals Council warrants remand for an
26   agency evaluation of rheumatoid arthritis.  The Court will examine
27   each in turn.
28   ///

Page 28 - FINDINGS AND RECOMMENDATION

**A.    Rejection of Dr. Rogers' Opinion**

Under Ninth Circuit case law, "[g]reater weight must be given to the opinions of treating physicians, and in the case of a conflict 'the ALJ must give specific, legitimate reasons for disregarding the opinion of the treating physician.'" *Batson v. Comm'r Soc. Sec.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).  Where the treating physician's opinion is not contradicted, however, "it may only be rejected for 'clear and convincing' reasons." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995) (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir 1991)).  Decker and the Commissioner agree that the ALJ only needed to provided specific, legitimate reasons for disregarding Dr. Rogers' opinion, but disagree about whether he did so.[8]

Decker claims that the ALJ did not address Dr. Rogers' opinion "at all and so gave no reasons and thus, insufficient reasons to reject it." (Pl.'s Opening Br. at 5.)  The Court disagrees.  Dr. Roger's opinion is set forth in the June 16, 2010 treatment plan from ShelterCare that was prepared by Armstrong, a qualified mental health professional who is not an acceptable medical source, *see Vandeveerdonk*, 2011 WL 4001059, at *6, which was cosigned by Dr. Rogers.[9]  Thus, with respect to this assignment of error, the

---

[8] (Pl's Opening Br. at 5) ("To reject [Dr. Rogers'] opinion, the ALJ had to give specific and legitimate reasons."); (Def.'s Br. at 8) (arguing that the ALJ provided specific and legitimate reasons, supported by substantial evidence, for disregarding "Dr. Rogers' cosigned opinion.")

[9] (Tr. 821) (explaining that, during Decker's first few weeks of involvement with ShelterCare, Armstrong met with Decker "intensively to complete a comprehensive mental heath assessment

proper inquiry is whether the ALJ gave specific, legitimate reasons for disregarding Armstrong's opinion because it was essentially transformed into that of an acceptable medical source based on Dr. Rogers' supervision and agreement with Armstrong's psychiatric diagnoses, as evidenced by his signature on the June 16, 2010 treatment plan. *See, e.g., Taylor v. Comm'r Soc. Sec.*, 659 F.3d 1228, 1234 (9th Cir. 2011) ("To the extent [the 'other source'] was working closely with, and under the supervision of [an acceptable medical source], [the] opinion is to be considered that of an acceptable medical source.'"); *see generally Mack v. Astrue*, No. 12-cv-01221, 2013 WL 163535, at *5 (N.D. Cal. Jan. 15, 2013) (collecting cases that discuss how district courts have interpreted the revision to 20 C.F.R. § 416.913 and the scope of the exception to the "acceptable medical sources" definition contained in the regulations).

In *Worden v. Astrue*, 478 F. App'x 356 (9th Cir. 2012), the ALJ provided specific and legitimate reasons for rejecting the opinion of a treating physician based on "the treating physician's reliance on subjective comments by [the claimant], whose credibility the ALJ had already discounted, and the lack of support for his opinions in his own treatment records, the longitudinal record, and [the claimant]'s report of her daily activities." *Id.* at 358. Similarly, in *Tonapetyan v. Halter*, 242 F.3d 1144 (9th Cir. 2001), the Ninth Circuit explained that, "[a]lthough the contrary opinion of a non-examining medical expert does not alone constitute a

and *to write a treatment plan with her*.") (emphasis added); (Pl's Br. at 4) (noting that the June 16, 2010 treatment plan prepared by Armstrong was "signed as a team leader" by Dr. Rogers).

Page 30 - FINDINGS AND RECOMMENDATION

specific, legitimate reason for rejecting a treating or examining physician's opinion, it may constitute substantial evidence when it is consistent with other independent evidence in the record." *Id.* at 1149.

As in *Worden* and *Tonapetyan*, the Court concludes that the ALJ provided specific, legitimate reasons for disregarding Armstrong's opinion. In his written decision, the ALJ assigned Armstrong's opinion "little weight," seeing as how it went against "the weight of the objective evidence" and was not supported by Decker's activities of daily living. (Tr. 19) (citing Armstrong's August 24, 2010 questionnaire concerning Decker's mental residual functional capacity and Armstrong's August 24, 2010 letter, wherein she recounted (1) Decker's treatment at ShelterCare, which began on May 24, 2010; and (2) the tests that were conducted and reports received, which supported the psychiatric diagnoses set forth in the June 16, 2010 treatment plan). The ALJ also noted that a review of Exhibit 46F, which included a copy of the June 16, 2010 treatment plan, (Tr. 962-66), "demonstrat[ed] that with few exceptions . . . [Decker]'s subjective reports form[ed] the 'objective' evidence in this exhibit." (Tr. 20.) As discussed further below, the ALJ discredited Decker's symptom testimony.

These reasons were supported by substantial evidence in the record, *see Reddick*, 157 F.3d at 720 (explaining that substantial evidence is that which a reasonable person might accept as adequate to support a conclusion), including, but not limited to, the following: On April 11, 1997, Dr. Lange evaluated Decker and concluded that she functions at the high school level in reading and arithmetic, and possessed an intellectual capacity "solidly in

1  the average range." On February 28, 2006, a full body physical
2  capacity evaluation at Chehalem Physical Therapy revealed that
3  Decker could "perform sedentary light work duties without
4  significant increase in her pain symptoms." In July 2006, Decker
5  attended a four-month course at Computer Skills Plus, Inc. and was
6  able to successfully update "her skills to make her competitive
7  once again in the job market." On July 10, 2007, Decker's
8  vocational rehabilitation counsel reported that Decker exhibited
9  "far above average . . . enthusiasm, dependability and level of
10 skills" while volunteering at the Newberg Career Center as an
11 office assistant and customer service specialist.

12      On September 19, 2008, Shah completed a PRFCA and concluded
13 Decker did not meet or equal a "listing." Five days later, on
14 September 24, 2008, Tyutyulkova completed a Psychiatric Review
15 Technique Form, wherein she concluded that Decker's impairments
16 failed to satisfy the diagnostic criteria of listing 12.02 (organic
17 mental disorders), 12.04 (affective disorders) or 12.06 (anxiety-
18 related disorders). She also stated that Decker's "course of
19 depression is one of exacerbations and remissions with treatment,"
20 her anxiety disorder was treated successfully by her primary care
21 physician, and her allegation of PTSD was "not supported by the
22 evidence." The MRFCA completed by Tyutyulkova on the same day
23 describes Decker as "[m]oderately [l]imited" in six of twenty
24 categories of mental activity and "[n]ot [s]ignificantly [l]imited"
25 in fourteen.[10]

26

27      [10] By contrast, Armstrong's August 24, 2010 questionnaire
   concerning Decker's mental residual functional capacity describes
28 Decker as "[m]arkedly [l]imited" in seven of twenty categories of

On November 13, 2008, Decker was examined by Dr. Perry, who concluded that Decker had (1) no workplace environmental limitations; (2) no manipulative limitations; (3) the ability to "lift and carry 20 pounds occasionally and 10 pounds frequently secondary to her bursitis"; and (4) occasional postural limitations with respect to "stopping, kneeling, crouching, and crawling." On December 5, 2008, a St. Vincent de Paul case manager urged Decker to "stop counting" on her daughter's social security survivor benefits for financial assistance, and instead "focus on obtaining employment to support herself." On December 24, 2008, after being informed that Decker had recently been denied SSI benefits, a St. Vincent de Paul job placement specialist stated: "[W]hile we feel for [Decker's] situation, we are concerned that much of [her] condition is affectation, as was reported by the Chehalem Physical Therapy report during her physical examination[.]"

After expending substantial time, effort and money, OVRS discontinued Decker's services on February 2, 2009, based on her failure to cooperate. St. Vincent de Paul also closed Decker's file, noting in particular that they did not feel that Decker's "true goal was to find meaningful employment." On June 29, 2010, Decker saw Lamoreaux "with a complaint of 10/10 pain regarding multiple body parts," but "the nerve conduction test showed no evidence of ulnar neuropathy." On August 20, 2010, Armstrong reported that Decker scored a 27 out of 30 on the MMSE, which presumably places Decker in the mildly impaired range. On October 25, 2010, Decker was examined by Dr. Brewster, who found Decker to

---

mental activity, "[m]oderately [l]imited" in eleven, and "[n]ot [s]ignificantly [l]imited" in the remaining two.

1  be "grossly alert and oriented to person, place and time" based on
2  her ability "to give comprehensive history and . . . follow multi-
3  step directions." Without reviewing the medical record, and after
4  conducting a comprehensive physical exam, Brewster concluded that
5  there was "no objective basis to limit Decker to the degree
6  estimated." On November 1, 2010, Decker was treated by Dr. Pelz,
7  who described Decker as "very highly functioning."

8      In short, the ALJ is responsible for resolving conflicts and
9  ambiguity in medical evidence. *Reddick,* 157 F.3d at 722. The ALJ
10 has done so here; the Court will not substitute its judgment for
11 his. *Id.* at 721-22.

12     Before moving on to the next assignment of error, it is
13 important to note that the ALJ discredited Decker's credibility in
14 his written decision. (Tr. 17.) In her opening brief, Decker does
15 not argue that the ALJ failed to provide "clear and convincing
16 reasons" for discrediting her symptom testimony. *Lingenfelter v.*
17 *Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007). As a result, the
18 Commissioner argued that Decker had waived any challenge to the
19 credibility factors articulated by the ALJ by not addressing them
20 with *specificity* in her opening brief. Most likely, the
21 Commissioner is referring to the fact that Decker made a passing
22 reference to "the ALJ's credibility findings . . . no longer
23 be[ing] supported by substantial evidence," (Pl.'s Opening Br. at
24 5), based on the new evidence (e.g., medical records provided by
25 Workman for the period December 27, 2010, through January 31, 2011)
26 that has been presented.

27     Although it is not clear to the Court whether Decker is
28 attempting to challenge the ALJ's adverse credibility finding, the

Page 34 - FINDINGS AND RECOMMENDATION

1 Court notes that: (1) the ALJ provided several specific, clear and
2 convincing reasons for discrediting Decker's testimony, such as
3 evidence of symptom exaggeration, provision of misinformation,
4 inconsistent statements regarding Decker's abuse of marijuana,
5 failure to provide an adequate explanation for her sudden lack of
6 participation in vocational rehabilitation activities, and
7 inconsistences between Decker's actions or achievements, as
8 compared to the level of impairment alleged, *see Smolen v. Chater*,
9 80 F.3d 1273, 1284 (9th Cir. 1996) (adverse credibility
10 determination may be based on ordinary techniques of credibility
11 evaluation, such as the claimant's reputation for lying, prior
12 inconsistent statements concerning the symptoms, and other
13 testimony by the claimant that appears less than candid;
14 unexplained or inadequately explained failure to seek treatment or
15 to follow a prescribed course of treatment; and the claimant's
16 daily activities."); *see also Verduzco v. Apfel*, 188 F.3d 1087,
17 1090 (9th Cir. 1999) (finding clear and convincing reasons where
18 the ALJ pointed "out several areas in which the appellant's
19 testimony or behavior was inconsistent with his own statements or
20 actions, as well as with the medical evidence."); and (2) the new
21 evidence presented does not negate the presence of substantial
22 evidence that supports the ALJ's adverse credibility determination,
23 *see Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). There
24 simply is too much evidence in the record that would support an
25 adverse credibility determination, regardless of whether the
26 January 31, 2011 laboratory results suggest that Decker's condition
27 had worsened.
28 *///*

Page 35 - FINDINGS AND RECOMMENDATION

**B.    New Evidence Submitted to the Appeals Council**

Decker next asserts that new evidence (e.g., medical records provided by Workman for the period December 27, 2010, through January 31, 2011) incorporated into the record by the Appeals Council warrants remand for an agency evaluation of rheumatoid arthritis. (Pl.'s Opening Br. at 5-6.)  As an initial matter, it is clear that the ALJ already reviewed the evidence for the period December 27, 2010, through January 5, 2011. (*See* Tr. 22) (relying on Exhibit 47F—which includes medical records provided by Workman for the period December 27, 2010, through January 5, 2011—in the ALJ's January 27, 2011 written decision).[11]  Nevertheless, it is also clear that the Appeals Council "considered the . . . additional evidence" Decker submitted and made it "part of the record."  (Tr. 2, 5.)  This new evidence included laboratory results dated January 31, 2011, (Tr. 5) (citing Ex. 48F, Tr. 975-77), and the district court must consider it in determining whether the Commissioner's decision is supported by substantial evidence. *See Brewes*, 682 F.3d at 1160-61 ("We hold that when a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence.")

---

[11] Because the ALJ already considered Exhibit 47F, the Court agrees with the Commissioner that this was not new evidence, as contemplated by the Ninth Circuit in *Brewes v. Comm'r Soc. Sec.*, 682 F.3d 1157 (9th Cir. 2012).

1    The Commissioner argues that the January 31, 2011 laboratory
2  results pertained to the period after the ALJ's January 27, 2011
3  decision, and therefore do not apply to Decker's current petition
4  for benefits. *See* C.F.R. § 404.970(b) ("If new and material
5  evidence is submitted, the Appeals Council shall consider the
6  additional evidence only where it relates to the period on or
7  before the date of the administrative law judge hearing decision.")
8  Perhaps there is an argument to be made that the Appeals Council
9  should have abstained from considering the January 31, 2011
10 laboratory results under § 404.970(b). But it is inescapable that
11 when, as here, "the Appeals Council considers [the] new evidence in
12 deciding whether to review a decision of the ALJ, that evidence
13 becomes part of the administrative record, which the district court
14 *must* consider when reviewing the Commissioner's final decision for
15 substantial evidence." *Brewes*, 682 F.3d at 1163 (emphasis added);
16 *Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (holding that a district
17 court reviewing the Commissioner's decision must consider the
18 record as a whole).

19   On January 31, 2011, laboratory results revealed several
20 abnormal findings: Decker's rheumatoid factor was elevated to 73,
21 as against normal values of 0-15 IU/ml; her sedimentation rate,
22 westergren was elevated to 76, as against a normal rate of 0-25
23 mm/hr; her platelet count was 406, as against normal values of 150-
24 400 k/mm3; and her red cell distribution width was 14.5%, as
25 against normal values of 11.5-14.2%.[12]  (Tr. 975-76.)  As Decker's

26

27        [12] In her opening brief, Decker incorrectly refers to the date
28 of these laboratory results as "January 6, 2011." (Pl.'s Opening
   Br. at 6-7) (citing Ex. 48F, Tr. 975.)  As the Court has noted,

Page 37 - FINDINGS AND RECOMMENDATION

1  counsel points out, "it would take a physician to interpret these
2  laboratory result and treatment results, and to place them in
3  context with [Decker]'s complaints of multiple areas of pain,
4  particularly her right hip and left wrist and thumb, these results
5  do suggest to a reasonable reader the possibility of rheumatoid
6  arthritis and inflammation." (Pl.'s Opening Br. at 7.)

7       The Commissioner contends that the January 31, 2011 laboratory
8  results are "inconsequential to the ultimate nondisability
9  determination" and do "not change the fact that substantial
10 evidence supports the ALJ's decision." (Def.'s Br. at 13.)  The
11 Court disagrees with the Commissioner on this point.  Admittedly,
12 there is evidence in the record that would support the ALJ's
13 decision.  For example, on October 5, 2010, Decker told Chaplin she
14 had a "she had a history of rheumatoid arthritis," but Chaplin said
15 Decker "has had labs [at RiverBend] in the last 6 months that are
16 not consistent this [based on her] normal [C-reactive protein] and
17 [erythrocyte sedimentation rate]." (Tr. 924.)  Then, on December
18 6, 2010, Decker reported that "she may have rheumatoid arthritis,"
19 but Workman did not see "anything in her records to confirm this."
20 (Tr. 916.)  Nevertheless, Workman ordered further testing that
21 suggests, inter alia, an elevated rheumatoid factor and change in
22 Decker's sedimentation rate.  Without knowing Workman's
23 interpretation of these results, the Court is essentially being to
24 asked to rule that substantial evidence supports the ALJ's
25 disability determination, even though the January 31, 2011
26 laboratory results could conceivably suggest the onset of a far

27  ───────────────

28 Exhibit 48F is dated January 31, 2011. (*See* Tr. 975-77.)

Page 38 - FINDINGS AND RECOMMENDATION

greater degree of impairment than that which had previously been contemplated.   Certainly there is at least a possibility that Workman could interpret these results in a way that warrants a departure from the ALJ's decision.   For the Court to say otherwise would be particularly misguided given its lack of medical expertise.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's decision should be REVERSED and REMANDED for further proceedings.

## VII. SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.   Objections, if any, are due **July 17, 2013.**   If no objections are filed, then the Findings and Recommendation will go under advisement on that date.   If objections are filed, then a response is due **August 5, 2013**.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 28th day of June, 2013.

/s/ Dennis J. Hubel

_____

DENNIS J. HUBEL
United States Magistrate Judge

Page 39 - FINDINGS AND RECOMMENDATION